Nott, J.,
delivered the opinion of tbe court:
When Major-General Frémont assumed tbe command of tbe Western Department in tbe summer of 1861, be proceeded with *279 characteristic energy to organize an army for his department. At that time the State government of Missouri was in a disorganized condition, the seat of the general government at a distance, the War Department overburdened and clogged by an accumulation of business, and General Frémont was thrown upon his own resources and told by the President and Secretary of War to exercise whatever powers were necessary for the public defense.
One of the methods of organization which he adopted was to appoint and temporarily commission such officers as were not appointed and commissioned by the governors of other States, it being supposed .by him and by them that these appointments would be ratified by the government and that in due time commissions would .be issued by the President. Such officers immediately entered upon their military duties, wearing the uniform of the United States, assuming responsibility, exercising command,'and sharing in the dangers and hardships of active service, being regarded by the public as possessed of all the authority of regularly appointed and commissioned officers. Ultimately a different policy was adopted by the government, some of these officers being transferred to the States from which they or their commands came, and commissioned by the governors thereof, the remainder being discharged from service.
Among these temporarily commissioned officers were nearly all of General Frémont’s staff, one of whom was Col. Edward H. Castle. He was assigned to the duty of superintendent of railroad transportation, with the rank and pay of colonel on the staff. Under him were a lieutenant-colonel, major, and captain, with twenty-four assistants. By virtue of this appointment of General Frémont’s, Colonel Castle performed the services of a quartermaster in charge of military transportation, and controlled and directed the railway transportation of troops and supplies throughout the Western Department as effectually as if he had been a regularly commissioned officer in the Quartermaster Department assigned to duty on General Frémont’s staff. By referring to Mowry’s Case (2 C. Cls. R., 68), it will be seen that the railway ears which formed the subject of that action were, by the terms of a contract made .by the chief quartermaster of the department, to be built according to plans and specifications to be furnished by Colonel Castle, that they were to be subject to his acceptance, and that they were turned over to him when completed.
*280 It is a familiar principle of law that a title to an office cannot be tried in a collateral suit or proceeding. If the officer was an officer defacto, it would be held in a suit between third persons that the question whether he was an officer de jure could not be put. in issue. But whether a contract made by a defacto officer would bind the government in a case where it would be valid if made by an officer properly commissioned, and whether the government, like an ordinary principal, would be bound by the acts of one who was allowed by the highest executive authority to act as a public agent, are questions which it is not necessary to determine now.
The Act 25th March, 1862 (12 Stat, L., 371), recognizes those officers of the Western Department as having been “ actually employed m the military service,” and provided for the payment of their services as if they had been regularly commissioned officers. It is not to be supposed that Congress intended to ratify their services, so far as they themselves were concerned, and to leave innocent third persons, who dealt with them on the faith of their being officers of the United States, to suffer from a technical want of authority. No discrimination has ever been exercised by Congress when appropriating for the expenses of the Western Department, or for the awards of the Holt-Davis-Campbell Commission, or for the gunboat flotilla upon Western rivers, between contract-debts created by regularly or irregularly commissioned officers. This suit is the first instance, we believe, where such a distinction has been taken, and we are of the opinion that at this late day it cannot be sustained.
Moreover, as a custodian of public property, which Colonel Castle unquestionably was, it was his duty to take reasonable precautions to secure its preservation; and where perishable property was exposed to the weather, nothing could be more reasonable than that he should have tarpaulins to cover it. That these tarpaulins were not taken up on the property returns of the quartermaster to whom Colonel Castle sent them was no responsibility of the owner. It was sufficient for him that he delivered them to one acting as a public officer for use in the government service, and that they were used by officers of the government in the preservation of public property. An implied contract arises from such acts, under the decisions of the Supreme Court in Solomon’s and Clark’s Cases (19 Wall., 17; 95 U. S., 539).
*281 As to the measure of damages, we are of the opinion that this is the case of a bailment for hire, where the bailee is bound to pay the agreed or a reasonable compensation for the use of the thing, and to return it in as good order and condition as when received, reasonable wear excepted, or in case of its loss or destruction to pay for its use until it was destroyed, and its reasonable value at the time of the loss. (Smith’s Case, 9 C. Cls. R., 237.) The claimant here assumes that the tarpaulins continued in use throughout the-entire period of the war, and he seeks to recover compensation accordingly. He admits that he was paid for their use for a period of eighty-six days, that they could not then be found, and that they have never been traced to the custody of any officer, nor known to have been in the government service after the expiration of this period for which he was paid their hire. On these facts, we are of the opinion that his damages must be restricted to their value, and that he cannot recover for their use.
The judgment of the court is that claimant recover of the defendants the sum of $2,250.